IN THE MATTER OF BURRIS, *Appellant.*

1. **Section 32, Article 4, Constitution of 1865,** required that the title of an act of the Legislature should indicate the general subject of the act, but did not require that it should set out its substance.

2. **Clerk's Fees**: SECTION 24, ARTICLE 6, CONSTITUTION of 1865, fixed the maximum of the compensation of clerks of courts at twenty-five hundred dollars, but left it to the Legislature to determine what compensation they should receive within that maximum. (SHERWOOD, C. J., dissenting.)

3. **Constitutionality of Laws.** The courts are warranted in declaring an act of the Legislature void only where there is a clear conflict between it and the Constitution.

*Appeal from Clay Circuit Court.*—HON. GEO. W. DUNN, Judge.

*D. C. Allen* for appellant.

1. The construction and plain meaning of Sec. 24, Art. 6, logically and grammatically demand that the words "over that sum," be held to refer to the previously mentioned sum of $2,500, for the simple reason that there is no other sum mentioned. The direction to pay the surplus *over that sum* entirely excludes the idea that the court has power to direct the payment of a surplus over a *less*

sum, and forbids the court to allow the clerk to retain for his own use a greater sum than $2,500. The section fixes the standard for the court, and does not allow it to draw the line above or below it. When the court has allowed for deputies and assistants, it has only one power left, to exhaust its function under section 24, and that power is to direct the clerk to pay all surplus *over that sum* into the county treasury. After allowances to deputies and assistants, the court has no option to vary to the right or the left, but only to direct the payment of the surplus *over that sum*, or, over $2,500, the sum previously mentioned in the section, into the county treasury.

2. The act of March 30th, 1874, is unconstitutional and void, as being in contravention of Sec. 32, Art. 4, constitution 1865. The title does not indicate whether the act refers to the amount of the compensation or salary of clerks, to their fees for the individual items of clerical labor, (as in Wag. Stat., p. 618,) to their clerical duties, (as prescribed in many statutes,) or whether it is an act penal in its nature, inflicting penalties for misfeasance, malfeasance or non-feasance. The title does not refer to the subject of fees. The purpose of Sec. 32, Art. 4, plainly was that the title of an act should impart an idea of its contents. Would any one suppose from the title of this act that it was intended to enforce Sec. 24, Art. 6, of the constitution?

*W. H. Woodson, contra.*

1. It could not have been intended by the provisions of this section that the Legislature had no power to fix the amount of the salary of the clerk of a court at a less sum than $2,500. The constitution merely restricts the power of the Legislature and forbids a greater sum than $2,500 to be given a clerk. If this is not the meaning why the necessity of demanding that the General Assembly shall pass laws to carry into effect the provisions of the section?

If there had been no legislation making a deduction from this amount then appellant under the facts and said section would be entitled to the sum of $2,500. If, however, the Legislature has enacted a law fixing the fees of clerks at a less sum than $2,500, and that too prior to the adoption of the constitution of 1875, then appellant can only receive the amount so fixed by law for his services as clerk, and such act of the General Assembly would not be unconstitutional and void, as contended by appellant in his instruction. It has enacted such a law in the act of March 30th, 1874.

2. Surely the constitution of 1865 did not intend that the title to acts of the Legislature, where only one subject matter was the subject of legislation, should specially set forth the contents of each and every section of the act. There are but few, if any, titles to acts in the session acts of the General Assembly for the year 1874, more clearly set forth than in the title of the act approved March 30th, entitled "An act in relation to clerks of courts of record." All that the constitution demands has been complied with in the title of the act aforementioned. All that it required was to have the titles of all laws passed, sufficiently stated so as to enable one to know at a simple glance at the title the subject matter of the act—whether it be in relation to clerks, administrators, executors, guardians and curators, corporations, or any other subject.

HENRY, J.—During the year 1875, Luke W. Burris was clerk of the county court of Clay county, and on the 11th day of February, 1876, he filed with said county court a statement of the fees and emoluments received by him as clerk during the year 1875, showing an aggregate of $3,605.46. This statement was finally passed upon by the county court at its November term, 1876, and allowing said clerk $1,500 paid to assistants, and $1,500 for his compensation, ordered him to pay into the county treasury the balance, $605.46. From this judgment he appealed to the

circuit court of Clay county, and that court having affirmed the judgment, he has prosecuted his appeal to this court. The 24th section of the 6th article of the constitution of 1865, provided that, " no clerk of any court established by this constitution, or by any law of this State, shall apply to his own use, from the fees and emoluments of his office, a greater sum than two thousand five hundred dollars tor each year of his official term, after paying out of such fees and emoluments, such amounts for deputies and assistants in his office as the court may deem necessary and may allow ; but all surplus of such fees and emoluments over that sum, after paying the amounts so allowed, shall be paid into the county treasury for the use of the county. The General Assembly shall pass such laws as may be necessary to carry into effect the provisions of this section." The General Assembly by an act entitled " an act in relation to the clerks of courts of record," approved March 30th, 1874, (Sess. acts of 1874, page 63,) declared that " The aggregate amount of fees that any clerk of a court of record shall be allowed to retain, shall not in any case exceed the amounts hereinafter set out. In all counties having a population of forty thousand persons, or over, the clerk shall be permitted to retain twenty-five hundred dollars. In all counties having a population of thirty thousand and less than forty thousand persons, the clerk shall be allowed to retain twenty-two hundred and fifty dollars. In all counties having a population of eighteen thousand, or over, and not exceeding thirty thousand persons, the clerk shall be allowed to retain two thousand dollars; and in all other counties the clerk shall be allowed to retain the sum of fifteen hundred dollars per year—in all cases the population to be ascertained from the last State, or United States census." The population of Clay county in 1875, it is agreed, was less than eighteen thousand. Appellant contends that the act of the Legislature is in conflict with the 24th section of the 6th article of the constitution of 1865, and also with the 32nd section of the 4th article of said

constitution, which is as follows: "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed."

We do not think that the act was unconstitutional, because in the title the particular subject of the act was not

1. SECTION 32, AR-
TICLE 4, CONSTITU-
TION OF 1865.

stated. It was not intended that the substance of the act should be embraced in the title; but that the subject should be stated in general terms, not specifically. For instance, an act was passed by the General Assembly in 1877, entitled "An act for the protection of married women." The title does not indicate in what that protection was to consist. By the title alone, one would not know whether it was to protect married women in their rights of property or in their persons, or in what manner the protection was to be afforded, whether by conferring upon them the right of suffrage, or the right to control intemperate and improvident husbands, and providing means by which that object could be accomplished by them; but it does apprise one that it is a law for their protection, and any provision in the law not cognate to that general subject, would be unconstitutional. The constitutional provision simply requires that the title shall give information of the general subject of the act, and that the act shall not contain provisions in nowise pertaining to that general subject. Here the title was, "An act in relation to the clerks of courts of record," and sufficiently indicated, not what its specific provisions would be, or to what duties of such officers it would relate, or how it would affect them, which the constitution did not require, but that its provisions would relate to clerks of courts of record, and nothing else.

Whether the law was in conflict with the 24th section, article 6, is a more difficult question. The clerks of courts

In the Matter of Burris.

2. CLERK'S FEES: section 24, article 6, constitution of 1865.

of record receive no salaries, but derive their compensation from fees fixed by law, for services by them from time to time rendered. The clerks of some courts do not realize $2,500 per annum from the fees and emoluments of their offices, while others now, as in 1865, realize amounts from the fees and emoluments largely exceeding $2,500. What object did the framers of the constitution of 1865 intend to accomplish by the section under consideration? Was it to fix the salaries of clerks of courts? It does not provide that they shall receive $2,500 as a salary or compensation; for the fees and emoluments of the office, in many counties, would not then, or since, yield that amount. The constitution of 1865 did not fix the salary of any other officer, not even the highest executive or judicial officer, and it is difficult to believe that the convention regarded the salaries of clerks of courts of record, as of such importance as to demand that they should be prescribed by the constitution, leaving salaries of all the other officers in the State to be established by the Legislature. Section 13, article 9, of the present constitution, provides that "the fees of no executive, or municipal officer of any county, or municipality, exclusive of the salaries actually paid to his necessary deputies, shall exceed the sum of $10,000." It re quires the officers to make quarterly returns of all fees received by them, and of the salaries actually paid to their deputies and assistants, but makes no provision in regard to the surplus. The first clause of the 24th section of article 6 of the constitution of 1865, is substantially the same as the 13th section of article 9 of the present constitution, except as to the sum; and if the section contained nothing more, there could be no doubt that it would be construed as fixing the maximum of the compensation of clerks of courts, and leaving to the Legislature to determine what compensation they should receive within that maximum. It is the latter clause of the section which makes the difficulty. It provides that the surplus over

$2,500 and clerk hire, shall be paid into the county treasury; but does it necessarily forbid the Legislature from requiring a greater amount to be paid into the treasury? It requires the Legislature to pass an act for the enforcement of the provision, that so much shall be paid into the county treasury, but by no reasonable construction is it prohibited from requiring a greater amount of the fees and emoluments to be so disposed of. The General Assembly is under no restrictions as to legislation, except those imposed by the Constitution of the United States, or the Constitution of the State. The only express injunction upon the Legislature in section 24, is to enact laws to enforce its provisions; and it contains no express inhibition, except that no clerk shall receive exceeding $2,500, and we think no implied inhibition, except that the General Assembly shall not pass any law requiring less of the fees and emoluments received by the clerk than is required by that section, to be paid into the county treasury. The provision that they shall not receive more than a stated amount, is not equivalent to a provision that they shall receive that amount. A constitutional provision that an officer shall not receive a salary exceeding $5,000, is not to be construed as fixing his salary at that sum. After limiting the amount of the fees and emoluments which the clerk should retain for himself and the pay of assistants, the question naturally arose what should be done with the surplus? And to meet that suggestion, the latter clause required the surplus "over that sum" to be paid into the county treasury. Suppose that the words "over that sum," had been omitted; no difficulty would have existed. It would not then have been contended that the Legislature could not make the compensation less. The whole force of the argument, therefore, in favor of appellant, is derived from the use of the words, "over that sum." The constitution requires the General Assembly to pass an act or acts by which that surplus, at least, shall be paid into the county treasury. The General Assembly passed

an act requiring not only that amount, but a greater amount of the fees and emoluments of clerks to be paid into the county treasury. With what portion of that section is it in conflict? Clearly not with that which limits the amount of the clerk's compensation to $2,500, not with that which requires the surplus of fees and emoluments over $2,500 and clerk hire, to be paid into the county treasury. Here is a complete compliance with the constitutional provision, and a violation of no injunction contained in that provision either express or fairly inferable from its language. Requiring that amount to be paid into the county treasury is not a prohibition against a legislative act requiring more.

If the framers of the constitution had meant what is contended for by appellant, it would have been so clear and natural a declaration of that intent to provide, " That every clerk of a court of record shall receive per annum for his own use, all the fees and emoluments of his office until they amount to $2,500, and such additional sum as the court may allow of such fees and emoluments for assistants, and the surplus shall be paid into the county treasury," that we cannot conceive why this, or similar phraseology was not employed; and that it was not, is a strong argument against the construction of the 24th section for which appellant contends. It does not say how much the clerks shall receive, but what they shall not receive, and that whatever the legislative will might be on the subject, the General Assembly should not allow a greater compensation than the amount named in that section, and if it should fix no amount of compensation whatever, it should at least carry out that provision of the constitution. This we think the reasonable construction of that section. What was the evil to be remedied? The fees in some counties yielded the clerks a compensation wholly disproportioned to the labor and responsibility connected with the offices, while in others, they yielded an inadequate compensation for the devotion of their whole

time by the clerks to the duties of their offices, and it was to remedy that inequality, to some extent, that the provision was adopted.

But, admitting it to be a doubtful question, our duty is to uphold the act of the Legislature. Only when there is a clear conflict between a legislative enactment and the constitution, are courts warranted in declaring the law to be void. It is then a duty from the performance of which they should not shrink, but it is equally a duty to sustain the law when not clearly in conflict with the constitution. That much deference is due to a co-ordinate branch of the government. The judgment of the circuit court is affirmed. All concur except NORTON, J., not sitting, having been of counsel, and SHERWOOD, C. J., dissenting.

3. CONSTITUTION-
ALITY OF LAWS.

AFFIRMED.

SHERWOOD, C. J., DISSENTING.—I do not wonder that my learned associates experienced difficulty in arriving at the conclusion they have announced. I take it that the same rules of construction should prevail, whether you call the instrument a constitution or a contract; that all that is requisite in construing either, is to ascertain and follow the intent of the framers of the instrument. (Sto. Const., § 400; Potter's Dwarris). Mr. Justice Story, who, in his day, was thought to be conversant with the rules governing constitutional construction, said: "Constitutions * * * are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understanding. The people make them; the people adopt them; the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." (Sto. Const., § 451.) Let us apply, in the present instance, the rules of "common sense," and carefully note the result. If I tell a tenant on my farm, that

all over two-thirds of the crop of grain he raises on my premises, is to be delivered into my granary, does he not at once understand that he is to retain the residue? And would it not be the theme of long-continued rustic ridicule, should I, under such a contract, lay claim to any more than my third? Or, to make the hypothetical case more nearly parallel to the one at bar, suppose that I have a large farm and a number of tenants, and to save trouble in writing, I draw up and sign, for all my tenants a general memorandum in these words: "No tenant of mine shall apply to his own use, from the grain he raises on my farm, a greater number of bushels than 2,500; but all surplus of such grain over that amount, shall be delivered into my granary. A committee appointed by me shall make such rules as may be necessary to carry into effect the provisions of this memorandum." What would be the evident duty of the committee under such circumstances? Would it not be plainly this, to make such rules as would "carry into effect" the provisions of the memorandum?. Would it be in discharge of their duty if causing the delivery into my granary of anything more than the "surplus?" Would not any one who ever followed a furrow, or drove a team afield, readily understand the meaning of the memorandum? Would any court in Christendom venture to construe the memorandum in a different way than that I have indicated? Does it make any difference, in point of principle, that the memorandum treats of 2,500 bushels of grain and the constitution of 2,500 dollars? If the principle of construction of either instrument remains the same, then, of necessity, the result must be the same; in the one case the "surplus" in money going into the county treasury; in the other, the "surplus" in grain, into the landlord's granary. And there is no refuge from this result. The 24th section of the 6th article of the constitution, says in its conclusion: "The General Assembly shall pass such laws as may be necessary to carry into effect the provisions of this section."

Does the Legislature " carry into effect" the 24th section, by enforcing its provisions " in all counties having a population of 40,000 persons or over," and by refusing to enforce such provisions in all counties possessed of a less population ?   The 24th section aforesaid, says the Legislature shall enforce the provisions of that section.   That body, however, says, as to all counties possessing a certain population, we will yield obedience to the organic law ; but in all others, we will do as we please about it; and yet this legislative nullification of the 24th section as to seventy-five one hundredths of the counties of this State, is held by my associates to " carry into effect" the provisions of that section.   If such legislation carries into effect the 24th section, then, all I have to say is, that constitutional mandates sit lightly on legislative shoulders ; and the words abrogate and nullify, should hereafter, by all lexicographers, be declared as synonymous of enforce and effectuate.

Again, " affirmative specification excludes implication." The expression of one thing, is the exclusion of another. (Dwarris on Stat., 655, and cases cited.)   The framers of the constitution by expressly providing that " all surplus   * * * * * over that sum ($2,500) * * * shall be paid into the county treasury," must be supposed to have had the whole subject in mind, and to have intended that all money not " over that sum," should be retained by the clerk who earned it.   Thus, in *Maguire v. State Savings Association*, ( 62 Mo. 344,) we held that the Legislature by specially mentioning and providing for interest on the land tax, must be presumed to have had in contemplation the whole matter of affixing penalties for failure to pay taxes at the appointed time ; and therefore, intentionally negatived the accruing of interest on any species of property other than real, and that such presumption accorded well with the familiar maxim of frequent recognition in statutory construction; " *expressio unius exclusio alterius.*"   A similar ruling was made by us in *ex parte Snyder*, (64 Mo. 58,) where we held that the framers of the constitution by

.providing for the continued existence of such criminal courts as were " organized and existing," must be presumed to have had the whole subject under consideration, and to have intended to continue the existence of only such courts as answered to that description, i. e. were organized and existed. Applying the rule announced in both those cases, and indeed by all the authorities to the present one, there is little room left to doubt that the framers of the constitution of 1865, by merely specifying that "all surplus of such fees　*　*　over that sum " ($2,500) should be paid into the county treasury, intended by necessary and inevitable implication, that all money not " over that sum " should be retained by the official earning it. And, if I take into consideration the bare justice of the case, I can reach no different conclusion. Why should not the clerk of a sparsely populated county be as much entitled to the full meed of his labor as the clerk who, located in a county of abundant population, does no more? The work being the same, the pay also, in natural equity, should be no less. Whether then, I test the ruling sanctioned by my associates, by the rules of well settled construction, or resort to those of obvious fairness, I am for reversing the judgment.