# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

# STATE OF MISSOURI,

AT THE

## OCTOBER TERM, 1891.

*( Continued from Volume 106.)*

---

THE STATE, *Plaintiff in Error*, v. BURGDOERFER.

DIVISION TWO.

---

1. **Criminal Practice:** APPEAL OR WRIT OF ERROR BY STATE : STAT-UTE. The right of the state to appeal or to prosecute a writ of error in criminal cases "when any indictment is quashed or adjudged insufficient on demurrer or when judgment thereon is arrested" extends to all cases in which the indictment is for any reason held insufficient on such motion to quash, on demurrer or motion in arrest of judgment.

2. —— : —— : ST. LOUIS COURT OF CRIMINAL CORRECTION. A writ of error may be prosecuted by the state to review a judgment of the St. Louis court of criminal correction quashing an information, on the ground that the law on which it was drawn was unconstitutional.

3. **State Constitution :** TITLE OF STATUTE. The act of the legislature of April 1, 1891 (Laws, p. 122), entitled "an act to prohibit book-making and pool-selling," is not unconstitutional as containing more than one subject which is not clearly expressed in its title.

VOL. 107—1          ( 1 )

4.  **State Police Power:** POOL-SELLING, ETC. The prohibition of book-making and pool-selling is within the exercise of the police power of the state.

5.  **Federal Constitution:** FOURTEENTH AMENDMENT. Said act, being uniform in its application to all persons alike who come within its provisions, is not violative of the fourteenth amendment to the constitution of the United States.

*Error to St. Louis Court of Criminal Correction.*
HON. JAMES R. CLAIBORNE, Judge.

REVERSED AND REMANDED.

*C. H. Krum* on motion to dismiss writ of error.

The motion to dismiss the writ of error should be sustained. ( 1 ) By the terms of the statute creating the St. Louis court of criminal correction, as amended March 5, 1869, a writ of error can only be sued out by a defendant, and such writ will not lie in behalf of the state. Sess. Acts, 1869, sec. 26, p. 198. The statute in force at the time of the creation of the court of criminal correction, in regard to writs of error in criminal cases, was section 1, chapter 215, General Statutes, 1865. In *State v. Newkirk*, 49 Mo. 472, followed in *State v. Peck*, 51 Mo. 111, and in *State v. Cunningham*, 51 Mo. 479, it was held that, by virtue of the foregoing statute, a writ of error would lie in behalf of the state in cases where there had not been a trial and acquittal, and, therefore, in a case where a judgment had gone against the state on motion to quash. But, in *State v. Copeland*, 65 Mo. 497, followed by *State v. Cutter*, 65 Mo. 503; *State v. Hamilton*, 65 Mo. 667, and *State v. Cox*, 67 Mo. 46, it was held that the question involved in *State v. Peck* and *State v. Newkirk* was "but lightly considered," and that the statute did not receive a proper construction. The earlier cases were, therefore, expressly and in terms reversed, and the doctrine established that, under the statutes as they then existed, a writ of error would not lie in behalf of the state under any circumstances in

criminal cases. Therefore, under the law creating the St. Louis court of criminal correction, the right to an appeal or a writ of error is expressly limited and reserved to the defendant. None is granted to the state in any event. As the law creating that court is a special law and has never in terms been amended, its limited provisions as to appeals and writs of error must be held to override the general provisions of the code of criminal procedure, and hence, by reason of the exclusion of the special act, the most comprehensive enactment of the general law will not apply. *State v. Clark*, 54 Mo. 17. Especially must such be the rule of construction, when it is considered that when the special law creating the court of criminal correction was enacted, with its limitations as to appeals, the general law was in force, under which, from ordinary criminal courts of general jurisdiction, the state might appeal, under certain specified circumstances. R. S. 1865, ch. 215, secs. 13, 14. (2) But, if the view taken in the foregoing point is too narrow, so that recourse must nevertheless be had to the general provisions of the criminal code, then the writ of error must be dismissed, because the record shows that the judgment rendered below was not based upon any insufficiency of the information, either in substance or in form. It is the settled rule in criminal cases, that an appeal can be taken by the state only where it is allowed by statute. *State v. Copeland*, 65 Mo. 479 ; *State v. Bollinger*, 69 Mo. 577 ; *State v. Risley*, 72 Mo. 609. The same rule governs writs of error. *State v. Heisserer*, 83 Mo. 692. (3) Under Revised Statutes, sections 4289, 4290, the right of the state to prosecute an appeal is limited to those cases where the indictment has been adjudged to be insufficient either on motion to quash, or demurrer, or motion in arrest of judgment, because of defective indictment. It does not appear, nor is it claimed, that the indictment on which the state asks a judgment is insufficient either in form or in substance, but, on the

contrary, its sufficiency to support a judgment is admitted. As no review could be had on appeal, none can be had on writ of error. R. S. 1889, sec. 4292 ; *State v. Heisserer*, 83 Mo. 692 ; *State v. Bollinger*, 69 Mo. 577.

*John M. Wood*, Attorney General, *Bernard Dierkes*, Prosecuting Attorney, *Chas. P. & J. D. Johnson, Thomas B. Harvey, Chas. T. Noland* and *Valle Reyburn* for the State.

( 1 ) In all cases the courts presume that acts of the legislature are constitutional. The burden is upon him who alleges the contrary to prove it beyond a reasonable doubt. *State v. Addington*, 77 Mo. 110 ; *State ex rel. v. Laughlin*, 75 Mo. 147; *State ex rel. v. Ransom*, 73 Mo. 78 ; *County Court v. Griswold*, 58 Mo. 175. ( 2 ) Courts cannot declare an act of the legislature void, however unjust or impolitic it may be, unless it clearly conflicts with specific provision of the constitution, and unless its unconstitutionality appears beyond a reasonable doubt. *In re Burris*, 66 Mo. 442 ; *State v. Abel*, 65 Mo. 357 ; *Ewing v. Hoblitzelle*, 85 Mo. 64; *Kelly v. Meeks*, 87 Mo. 396. ( 3 ) The legislature had the authority, under the police power of the state, to enact laws against any particular form of gambling, because any and all gambling, in every form, is destructive of good morals, and against the general welfare of the public. *City of St. Louis v. Fitz*, 53 Mo. 582 ; Cooley, Const. Lim. [ 6 Ed. ] 704. ( 4 ) In determining whether a title clearly expresses the subject of an act of the legislature, the court should be guided by several well-settled rules of law, to-wit: *First*. The act is presumed to be constitutional, and that presumption continues until the court is convinced beyond a reasonable doubt that it violates some mandatory provision of the constitution. *State ex rel. v. Laughlin*, 75 Mo. 147 ; *State ex rel. v. Railroad*, 92 Mo. 137 ; *State v. Able*, 65 Mo. 362 ; *State v. Hope*, 100 Mo. 347 ; *State ex rel. v. Pond*, 93 Mo.

606; *Kelly v. Meeks*, 87 Mo. 396; Cooley, Const. Lim. [6 Ed.] 216; *State v. Railroad*, 48 Mo. 468; *In re Burris*, 66 Mo. 442. *Second.* Words are to be construed according to their usual and ordinary meaning, and, if two constructions are permissible, one of which will sustain the law and the other render it invalid, courts will always adopt that construction which will uphold the law. Courts always construe a law most favorably to its life and purpose. *State ex rel. v. Finn*, 8 Mo. App. 341; *State v. New Madrid*, 51 Mo. 82; *Phillips v. Railroad*, 86 Mo. 540; *State v. Leffingwell*, 54 Mo. 458 (as to definition of words, how to interpret them); *Henry & Coatsworth Co. v. Eans*, 97 Mo. 47; Cooley, Const. Lim. 218. *Third.* "The title of a bill is sufficient if it fairly embraces the subject-matter covered by the act; mere matters of detail need not be stated." The legislature may select its own language and may use few or many words. "It was not intended that the substance of the act should be embraced in the title, but that the subject should be stated in general terms, not specifically." *In re Burris*, 66 Mo. 442; *State ex rel. v. Miller*, 100 Mo. 445; *St. Louis v. Tiefel*, 42 Mo. 588; *Ewing v. Hoblitzelle*, 85 Mo. 64; *Attorney General v. Ransom*, 73 Mo. 78; *Attorney General v. Mead*, 71 Mo. 266; *St. Louis City v. Green*, 7 Mo. App. 468, affirmed in 70 Mo. 562; *Luther v. Saylor*, 8 Mo. App. 424; *Jonesboro City v. Railroad*, 110 U. S. 199; Cooley, Const. Lim. [6 Ed.] 172. (5) With the wisdom, expediency or policy of an act of the legislature courts have nothing to do. The responsibility for the act rests upon the legislature. *State ex rel. v. Pond*, 93 Mo. 635; *County Court v. Griswold*, 58 Mo. 192; *Hamilton v. County Court*, 15 Mo. 3; *City of St. Louis v. Fitz*, 53 Mo. 582; Cooley, Const. Lim. [6 Ed.] 197, and cases cited; *Lake View v. Cemetery*, 70 Ill. 194; *Cearfoss v. State*, 44 Md. 403. (6) Gambling and the keeping of a gambling house, in the form of book-making, are not among the rights, privileges and immunities which the federal constitution says

shall not be abridged. And the act, being uniform in its application, operating upon all alike who come within its provisions, does not deny defendant the equal protection of the laws. *Barbier v. Connolly*, 113 U. S. 27 ; *Missouri v. Lewis*, 101 U. S. 22 ; *State v. Fisher*, 52 Mo. 174 ; Cooley, Const. Lim. 14, 489 ; *Slaughter House Cases*, 16 Wall. 36 ; *Hayes v. Missouri*, 120 U. S. 68. ( 7 ) The act in question does not by inference permit pool-selling on events occurring in Missouri ; it neither forbids nor permits such pool-selling as to adults ; it simply does not refer to it at all, but entirely prohibits gambling with minors.

THOMAS, J.—The assistant prosecuting attorney of the St. Louis court of criminal correction filed an information in that court on the twenty-sixth day of June, 1891, by which defendant was charged with keeping a pool-room and registering bets in violation of the act of the general assembly of this state, approved April 1, 1891, entitled, "An act to prohibit book-making and pool-selling." Sess. Acts, 1891, p. 122.

Defendant being taken before the court, on proper process, filed a motion to quash the information upon the grounds : *First.* Because the act upon which the information is based is unconstitutional, in that it violates section 28 of article 4 of the constitution of Missouri. *Second.* Because the act is unconstitutional, in that it violates section 4 of the bill of rights of the constitution of Missouri, and is against the law of the land.

The motion to quash was sustained by the court, on the ground first above indicated, and the state sued out the present writ of error. Defendant filed a motion in this court to dismiss the writ of error on the following grounds : *First.* That, under the statute creating the court of criminal correction of the city of St. Louis, a writ of error will not lie in behalf of the state to review any judgment against the state in any case cognizable

by said court of criminal correction. *Second.* That, under the code of criminal procedure, a writ of error will not lie in behalf of the state to review a judgment against the state rendered upon a motion to quash an indictment, or information, except where, upon such motion, the indictment or information has been held to be insufficient in substance or in form. *Third.* That the motion to quash, preserved in the record and sustained by the court below, was not based upon any insufficiency of the information in substance, or in form, but solely upon the ground of the unconstitutionality of the law under which said information was made, and the judgment of the court below in quashing the information was entered, not because of any insufficiency in form or substance of said information, but because of the invalidity of said law under the constitution of this state.

This motion was overruled by this court on the twenty-first day of ——, 1891, and, before proceeding to dispose of the case on its merits, we deem it appropriate to briefly state our reasons for this action of the court in respect of this motion.

The act creating the St. Louis court of criminal correction provides that it shall be a court of record, and that the proceedings therein shall be governed by the laws regulating practice in criminal cases, so far as the same may be applicable, and that "an appeal shall be allowed the defendant from any final judgment of said court to the supreme court ( St. Louis court of appeals ), if applied for within ten days after the rendition of such judgment, but not otherwise. The manner of taking such appeals shall be the same, as near as may be, as is prescribed by law for [ taking ] appeals from circuit courts in criminal cases. Writs of error shall be allowed upon any final judgment of said court, and may be prosecuted and issued from the supreme court ( St. Louis court of appeals ) in like manner ,and with

similar effect as writs of error to the St. Louis criminal court." 2 R. S. 1889, p. 2156.

Section 4303, Revised Statutes, 1889, provides that: "The provisions of this code applicable to the circuit court and the judges thereof shall also be applicable to any other court of record exercising criminal jurisdiction, and the judges thereof, in all cases when no other or different provision is made by law for the government and control of such courts and judges."

The statute creating the St. Louis criminal court provides as follows:

"Sec. 6. Appeals and writs of error, in case of final judgment or decision of said criminal court, may be allowed and prosecuted directly to the supreme court in the manner and with the effect, in all respects, as is prescribed by law in cases of such appeal or writ of error from the circuit to the supreme court in criminal cases." 2 R. S. 1889, p. 2150.

The General Statutes, 1889, on the subject of appeals and writs of error in criminal cases, have the following provisions: "Sec. 4289. The state, in any criminal prosecution, shall be allowed an appeal only in the cases and under the circumstances mentioned in the next succeeding section."

"Sec. 4290. When any indictment is quashed, or adjudged insufficient upon demurrer, or when judgment thereon is arrested, the court in which the proceedings were had, either from its own knowledge or from information given by the prosecuting attorney, that there is reasonable ground to believe that the defendant can be convicted of an offense, if properly charged, may cause the defendant to be committed or recognized to answer a new indictment; or if the prosecuting attorney prays an appeal to the supreme court the court may, in its discretion, grant an appeal."

"Sec. 4292. If no appeal be taken by or allowed to the state in any case in which an appeal would lie on

behalf of the state, the prosecuting attorney may apply
for and prosecute a writ of error in the supreme court,
in like manner and with like effect as such writ may be
prosecuted by the defendant."

The question is, whether the state is entitled to the
writ of error sued out in this case by virtue of the sec-
tions of the several statutes above quoted. It is not
necessary for us to decide, and we do not decide, but
we will assume, for the purpose of this case, that a writ
of error is not allowable under these sections, where an
appeal cannot be taken by the state.

Defendant's contention is that the above-quoted
sections of the statute, when properly construed, limit
the state's right to an appeal or writ of error to those
cases where the indictment or information is held
insufficient in form or substance, and when the court
has reason to believe the defendant may be convicted if
properly charged, and that the information in this case
was not quashed for any insufficiency of statement in
form or substance, but solely on the ground that the act
under which it was drawn is unconstitutional.

In the first place, the defendant in his argument in
support of his construction of these sections transposes
the language used. The language of section 4290 is:
"When any indictment is quashed or adjudged insuf-
ficient upon demurrer, or when judgment thereon is
arrested." The defendant insists that this language
"clearly indicates the intention of the legislature to
limit the discretion of the trial court to situations where,
upon motion to quash, demurrer or motion in arrest, an
indictment has been held insufficient."

In the second place, in order to maintain his
construction, he interpolates two words, "form or
substance," after the word "insufficient." The case of
State v. Bollinger, 69 Mo. 577, is cited with apparent
confidence in support of defendant's contention, both
as to the transposition of the language and the
interpolation of the two words "form and substance."

In that case the defendant filed what was termed a motion in arrest of judgment, for the reasons that defendant being a slave, and the party alleged to have been killed being a slave also, the alleged act of defendant, was not punishable under the law. The bill of exceptions recited that, "said motion was taken up, and, upon a hearing of the facts found by the court and the facts in the case as admitted and agreed upon by the prosecuting attorney and defendant," the court sustained the same. The court held that no appeal on behalf of the state would lie in such a case. In commenting upon the sections of the statute now under review, Judge NORTON, speaking for the court in that case, said: "We think it clear that, under the above section, the right of the state to prosecute an appeal is limited to those cases where the indictment has been adjudged to be insufficient either on motion to quash, on demurrer, or motion in arrest of judgment, because of defective indictment. It does not appear, nor is it claimed, that the indictment on which the state asks a judgment is insufficient either in form or substance, but, on the contrary, its sufficiency to support a judgment is admitted." And it was held that the state was not entitled to appeal, not because there was no such crime as murder, nor because the indictment failed to properly charge defendant with a crime, but because the court heard evidence and found from that evidence that defendant being a slave, and the party alleged to have been killed being also a slave, was not a person who could commit the crime charged, *i. e.*, he was excluded from the operation of the law defining murder.

Though the motion in that case was called a motion in arrest of judgment, it was not, in fact, such a motion. A motion in arrest of judgment is founded solely *on matters apparent on the face of the record*, which vitiates the proceedings. It raises a question of law only, and in its determination the court looks alone to the record. A question of fact must be raised by other

The State v. Burgdoerfer.

pleas. The motion in the *Bollinger case* was not founded on the record alone, but presented an issue of fact, and, for that reason, ought to have been rejected by the court ; but the court tried the issue of fact thus raised, and decided it in favor of defendant and discharged him. The facts presented by the motion could have been, and ought to have been, introduced on the trial before the traverse jury, when the court could have instructed as to the legal effect of such facts. If this had been done, and the court had declared by instruction that, if these facts were proved, defendant could not be convicted of murder, it is manifested the state would have had no right to appeal, and these facts being proved on the motion in arrest of judgment, and the court upon them having discharged defendant, the same result as to the state's right of appeal would follow. The judgment had not been arrested *on the record alone or* on the record at all, and, therefore, the statute had not provided for an appeal on behalf of the state. We quote further from the opinion in that case as follows: The judgment of the trial court was that these reasons '' (that is, the fact that the defendant and the party slain were both slaves) '' were sufficient to authorize the judgment to be set aside. * * * From the action of the trial court in that respect, the state cannot appeal any more than it could if, on the trial of the cause, the court had given a wrong instruction or instructed the jury that under the evidence they should acquit the defendant. Although such instructions might be erroneous and ultimate in the discharge of a criminal, no appeal could be taken by the state, because the law so declares.''

Taking the grounds of the decision and the facts, we do not regard that case as decisive of the question on the record now before us. It is true the opinion there gives color to the transposition of the language of the statute and the interpolation in it of the words

"form" and "substance." What the court meant by such transposition and interpolation it is difficult to tell. It seems this was done in that case as is often done in judicial decisions by the use of expressions, the far-reaching effects of which are not appreciated at the time. But the language of the judge must be construed in connection with the facts of the case in which it is uttered.

There are three cases where the state has a right to appeal: *First.* Where the indictment is quashed. *Second.* When the indictment is adjudged insufficient on demurrer. *Third.* Where the judgment thereon is arrested. The plain grammatical construction of this language would limit the word "insufficient," as a qualifying term, to the second phrase only. We do not see how it can be extended so as to qualify the first and third phrases, and yet, if the language is to be taken literally, that is what this court did in the *Bollinger case.* The transposition made by the court has that effect. The language of Judge NORTON is: "The right of the state to prosecute an appeal is limited to those cases where the indictment has been adjudged insufficient, either on motion to quash, on demurrer or motion in arrest of judgment." We can accept this language as a correct exposition of the statute, if the word "insufficient" be held to mean *any insufficiency for which a demurrer will lie.* The first clause is a general statement that an appeal will lie "when an indictment is quashed." There is no qualifying term used in connection with this declaration. Hence, if that stood alone, no one would question, we presume, that an appeal would lie on behalf of the state if any indictment be quashed for *any* of the reasons for which a motion to quash can be interposed. The next provision is, that an appeal will lie if the indictment be "adjudged insufficient on demurrer." Here we find a qualifying term, and the question is how far it was intended to limit not only the words used in

immediate connection therewith, but also the preceding and subsequent clauses. And here the interpolation mentioned comes in. With this interpolation the phrase would read that an appeal would lie if the indictment be adjudged insufficient on demurrer in "form or substance." And here we have introduced another term, "substance," for definition. We can readily determine the meaning of "form" in its connection, but what is the meaning of the word "substance" in that same connection?

Defendant evidently uses the terms "form" and "substance" as synonymous. He says: "No attack is made upon the information on the ground of insufficiency in form or substance." If he does not mean to convey the idea here that the failure of an *indictment to charge a crime* is not an insufficiency in substance, then he conveys no meaning at all except that a failure to charge a crime is simply an insufficiency in form. Mr. Bouvier defines substance as follows: "That which is essential; it is used in opposition to form." That definition meets our approbation so fully and seems so clear and concise that any further quotation in support of it or elaboration of it would be superfluous. Hence, when an indictment is adjudged insufficient in substance, it is because it lacks something essential to make a legal charge of crime. Certain portions of an indictment are formal, and some substantial. The statement or body of the indictment must set forth all the ingredients of the offense and charge the defendant directly and positively with the commission of it. This is the substance of the charge, because essential to it. But the most substantial part of the whole indictment is the charge of *an offense.*

But the argument is, that, if the indictment charges *no offense*, it is not insufficient within the meaning of that word as used in the statute under review. Let us illustrate this. An indictment for grand larceny fails to charge that the taking and conversion were done

feloniously.   Here an essential ingredient of the crime is omitted, and, hence, the indictment is insufficient in substance to put the party charged on his defense for that crime.   Suppose the indictment in that case should charge that the taking was done feloniously but omitted to set out the venue of the crime.   In such case the indictment would not be defective in substance, but in form only, for the party was charged with a crime, no matter where committed.   Suppose again, an indictment should charge, in a *formal* way, that a man being the owner of a horse feloniously took it to town with intent to sell it.   It is no crime for an owner to take his horse to town to sell it.   Now, could it be said that such an indictment was not insufficient in substance?   We clearly think not.   In such case the defendant would demur and say, "I concede I did what the indictment charges I did, but I challenge the sufficiency of the facts charged to constitute a crime in law."   The court sustains the demurrer, and very clearly in our opinion adjudges the indictment *insufficient* in substance.   If an indictment is insufficient for the failure to make one essential averment to constitute a crime punishable by law, *a fortiori* would it be insufficient, if it charged facts, which, if true, constitute no crime known to the law.   It seems to us, therefore, that granting the right to interpolate the words "form" and "substance" in the statute that the state would have the right of appeal when the indictment is adjudged insufficient for failure to charge facts constituting a crime.

That the word "insufficient" has not the restricted meaning contended for by defendant, appears from another consideration.   The word demurrer is used in its generic sense, and, when it is affirmed that an appeal will lie when an indictment is adjudged insufficient on demurrer, it must mean any insufficiency that can be presented by demurrer, and the failure to state facts constituting an offense is one ground of demurrer.   This is elementary law.   4 Black. Com. 333.   Another very

cogent reason why defendant's construction is not cor-
rect may be found upon a consideration of the context.
We have said enough in regard to the extent and limit
of the qualifying word "insufficient." The fact, that
the legislature did not see proper to put that qualifying
word in all the phrases of the section, proves conclu-
sively that an appeal could be taken upon sustaining a
motion to quash, demurrer or motion in arrest of judg-
ment for *any of the grounds on which either could be
interposed*, for it is inconceivable that the legislature
intended to allow an appeal when an indictment is
quashed for *any* reason, and not give it when a demur-
rer is sustained for any reason.   We cannot, and ought
not, to attribute to the legislature an intent to make a
distinction between a motion to quash and a demurrer
when there is no reason nor common sense in such dis-
tinction.

To allow an appeal when a motion to quash is
sustained for any reason, and not allow an appeal when
a demurrer is sustained for any reason, would mani-
festly be absurd,   And, again, it would be manifestly
absurd to hold that the state may appeal when the
court quashes an indictment or sustains a demurrer or
motion in arrest for some informality, which could be
corrected so as to make a legal charge, but deny the
right of appeal if the trial court sustains a motion to
quash, demurrer or motion in arrest, for the reason the
law under which the indictment is found is unconsti-
tutional, and, therefore, no law at all.   In the one case
the error, if any, is limited ; in the other it is coexten-
sive with the commonwealth.

The St. Louis court of criminal correction, as well
as all other courts of the state exercising criminal juris-
diction, can declare a law unconstitutional and void,
and, hence, non-enforceable ; so can all the trial courts in
the state, and, if no error of such courts in that respect
can be corrected by the appellate court, the most whole-
some laws may be made nugatory by one court, and

there be no remedy. The logic of defendant's argument is that the state can have the action of the trial court in holding an indictment defective, because it fails to use the word "feloniously" in its proper place and as often as required, reviewed by the higher courts, but, when the trial court sets at naught a law enacted and approved by co-ordinate branches of the government, the state is without remedy. This is grasping at the shadow and letting go the substance. "The presumption," says Endlich in his work on interpretation of statutes, section 264, "against absurdity in the provision of a legislative enactment, is probably a more powerful guide to its construction than even the presumption against unreason, inconvenience or injustice. The legislature may be supposed to intend all of these, but it can scarcely be supposed to intend its own stultification."

Our conclusion on this question is that the state has the right of appeal or writ of error when a motion to quash, demurrer or motion in arrest is sustained *on any of the grounds for which either will lie.*

We do not think the subsequent clause of section 4290, *supra*, that, upon sustaining a motion to quash, demurrer or motion in arrest, the court may hold the defendant if it has reason to believe that he "can be convicted of an offense, if properly charged," was intended to limit the state's right of appeal. The object of this provision was simply to bind defendant to appear and answer further, if the court should hold there was reasonable cause for it.

Having disposed of the question raised by the motion to dismiss the writ of error, we will now inquire whether the court below committed error in sustaining defendant's motion to quash the information on the ground that the act under which it was drawn is unconstitutional.

I. The first contention of the defendant is that the title of the act under which this information was

drawn, in its relation to the body of the enactment itself, fails to conform to section 28 of article 4 of the constitution of Missouri, which provides that "no bill   *   *   * shall contain more than one subject which shall be clearly expressed in its title," and the act is, therefore, inoperative and void. The title of the act is, "An act to prohibit book-making and pool-selling." The act itself provides that everyone shall be guilty of a misdemeanor, who keeps rooms for book-making or pool-selling, upon the result of any trial or contest of skill, speed, or power of endurance of man, or beast, which is to take place beyond the limits of this state ; or who makes books or sells pools on such events ; or who makes books or sells pools on the result of any political nomination, appointment or election wherever made or held ; or who makes books with or sells pools to minors on such events. It is claimed that the title of this act, in its relation to the act itself, fails to come up to the constitutional requirement quoted, in that the title does not express the subject of the act at all, but, if it should be held that the subject is expressed, it is not *clearly* expressed. The contention is that the title of the act is to "*prohibit,*" while the body of the act *regulates* book-making and pool-selling, and, therefore, the title does not contain the subject within the meaning of this constitutional inhibition.

It is settled in this state that this provision of the constitution is mandatory. And it is equally well settled that it should be liberally construed. *State ex rel. v. County Court*, 102 Mo. 531. The main question argued, and the main question, in our view, involved, in the case is : Does this act *prohibit* or *regulate* book-making and pool-selling ? If it is one of prohibition, and this is clearly expressed in the title, the act is valid. On the other hand, if it is one of regulation, it is invalid.

The provision of the nature of the one under review was first introduced in this state in the constitution of 1865 as follows: "No law *enacted by the general assembly* shall relate to more than one subject, and that shall be expressed in the title; *but, if any subject embraced in an act be not expressed in the title, such act shall be void as to so much thereof as is not expressed.*"

Four apparently important changes were made by the constitution of 1875. *First.* The word "bill" is substituted for "law enacted by the general assembly." *Second.* The words in the constitution of 1865 we have italicized are omitted. *Third.* The word "clearly" is inserted before the word "expressed." *Fourth.* The word "contain" is substituted for the words "relate to." There is, of course, a marked difference between "bill" and "a law enacted by the general assembly." We do not deem it necessary in this case, to enter into a discussion of the object of this change. It may or may not have been intended to affect the general intent of the provision, but whether it did or not we leave for future consideration, when a more doubtful case than the one in hand arises. The omission of the words we have italicized was intended probably to emphasize the general object of the provision, that a bill shall contain but one subject. The word "clearly" may have been intended to require greater precision in the title than was indicated by the use of the word "expressed" without a qualifying term. We do not deem it necessary, however, to elaborately discuss the effect these changes were intended to have upon the meaning and scope of this provision, and we will proceed at once to determine whether the act in question, entitled as it is, conforms to the inhibition as it exists in the present constitution.

This court has the undoubted right and authority to declare an act of the general assembly void on the ground that it fails to conform to or is in conflict with the

The State v. Burgdoerfer.

constitution. The constitutional provision under review has two distinct aspects in its relation to the power of the court to nullify an act for non-conformity to it. *First.* If the title of an act clearly fails to contain the subject, or the act clearly contains two *incongruous* subjects, whether expressed in the title or not, the act is void *per se*, without regard to whether legislators or people were misled or not. In such case the only question for the court to determine is, does the title clearly fail to contain the subject, or does the act contain two or more *incongruous* subjects? If the courts can answer this question in the affirmative, the act will be declared unconstitutional; if in the negative, it will be held valid. Here the courts can find some solid ground on which to stand. The main object of this inhibition was to require the title to contain the subject of the act and to prevent the insertion in the same bill of two or more *incongruous* subjects, not because legislators and people might be misled, but to prevent log-rolling and cross-lifting by which different interests might combine and succeed in enacting an *omnibus* statute that could never be passed if each subject had to stand or fall on its own merits or demerits. This principle finds many illustrations in the adjudged cases of this and other states. *State ex rel. v. County Court, supra;* Cool. Con. Lim. 170, *et seq.*, and cases cited in notes.

In the case at bar, it is claimed that the subject of the act as contained in its title is the *prohibition*, while the subject of the act itself is the *regulation*, of bookmaking and pool-selling, and, hence, that the title does not contain the subject of the act. The argument is, that a law which prohibits certain acts of a given class, inferentially permits the other acts of that class, and is, therefore, a law to *regulate the whole* class. The attorney for defendant cites in support of this contention the cases of *People v. Gadway*, 61 Mich. 285; *Town v. Sainer*, 59 Iowa, 26; *In re Hauck*, 38 N. W.

Rep. 272 ; *State v. Committee, etc.*, 14 Atl. Rep. 587, and *Miller v. Jones*, 80 Ala. 89.

Before examining these authorities we will advert to a fundamental error counsel has fallen into, in the discussion of the question. In order that we may present the position taken fairly, we quote from the brief and argument of defendant's attorney as follows: "The court has before it an act to *prohibit* book-making and pool-selling. The title is clear, positive and unequivocal. It declares that the subject of the act is the *prohibition* of book-making and pool-selling. It does not suggest that pool-selling or book-making of any description may be carried on at any place within this state. It declares that the subject of the act is absolute prohibition of book-making and pool-selling of every description. It does not advise the legislator who reads the act by its title that pool-selling and book-making upon events which occur within this state is made a lawful occupation by the subject-matter of the act." There is in this extract an erroneous assumption of fact and a false conclusion of law upon the fact assumed. The title does not declare " that the subject of the act is the *absolute* prohibition of book-making and pool-selling of *every description*." If it did there would be much plausibility in the argument that the title does not contain the subject. We must construe the title and the act as written. We have no right to interpolate words in the title or act or both, unless such words are necessarily understood, and we do not think the words " *absolute* " and " every description " are necessarily understood in the title of the act before us. The most serious error, however, in the quoted extract is the legal deduction the attorney makes. The assumption is that the act makes pool-selling and book-making on events to occur in Missouri *a lawful occupation*.

If that assumption were true, there would be some force in the argument that an act which prohibits some

things, and affirmatively sanctions others of the same class, is a regulative and not prohibitive act. But does this act do that? It is not pretended that it does in terms, but it is insisted it does inferentially. The contention is, that, when the state prohibits some things of a given class, it sanctions others of the same general class. There is a far-reaching fallacy underlying this contention. The state does not, in fact, or in contemplation of law, sanction all acts it does not prohibit, or for which it provides no punishment. It may seem proper to leave some wrongful acts of its citizens to be regulated by the usages of society, by public opinion and by the social and natural forces inherent in man's nature. There is a radical and fundamental distinction between a failure to provide punishment for an act and the sanction of it. Many illustrations of this distinction can be drawn from the civil and criminal laws not only of our state, but all states and countries. One will suffice for our present purpose. It is made a capital crime for a man to have illicit sexual intercourse once with a female under fourteen years old, whether with or without her consent, but, if the female be one day over the age of fourteen years, one single act of such intercourse with her with her consent is no crime at all. *State v. Crowner*, 56 Mo. 147; *State v. West*, 84 Mo. 440. Can it be said the state by not providing punishment for the latter act sanctions it? The statement of the question contains its own answer.

This phase of the subject is well illustrated by the agitation that grew out of the ordinances of the city of St. Louis a few years ago authorizing the licensing of bawdy-houses. The distinction between the state failing to punish an act, and its sanction of the act by granting a license to do it, was sharply made in that controversy, and the ordinance in question soon went down under the indignation of an outraged people. When the mothers and fathers, husband and wives,

brothers and sisters, of the state came to realize that they, in law, gave *affirmative* sanction to prostitution by authorizing its existence for a consideration by way of a license fee, they withdrew such sanction, emphatically and irrevocably.

The Louisiana lottery is another forcible illustration. This gigantic organization has become a national evil, *intensified by state sanction, authority and license.* Octopus-like it has laid its blighting hands upon every city and hamlet from ocean to ocean, corrupting the morals of the nation and drawing money from the people by the million. National sentiment, which this great wrong outrages, will, no doubt, ultimately compel the withdrawal from it of state authority to carry on its nefarious business.

The state, it is said, can do no wrong; but, whether this be true or false, it cannot be affirmed that the state in *any* case sanctions a *wrong,* in law or fact, for which it provides no punishment. On the other hand we believe we can safely affirm that the state sanctions nothing by implication. Our bill of rights guarantees life, liberty and the fruits of industry. Personal and property rights find their sanction in the common law of our state and of all states. These are imbedded in the fundamental laws of the land. They form a part of the *affirmative* jurisprudence of the state sanctified by time and experience. But, when the state provides a punishment for a part of a class of *evils,* it does not inferentially sanction the remainder of such class for which it does not see proper to provide a punishment. It does not by prohibiting one wrong sanction another. No positive law exists for the protection of transactions growing out of and founded upon bets and wagers. Book-making and pool-selling on "the result of any trial or contest of skill, speed or power of endurance of man or beast" on events to occur anywhere are not within the protection of the laws of Missouri. They are *contra bonos mores,*

and the courts will refuse to enforce contracts growing out of them.  *Hayden v. Little*, 35 Mo. 418.

Prize fighting, which is a contest of skill and power of endurance of man, is positively prohibited as criminal in this state.  Sec. 3557.  Betting on the result of elections is made a misdemeanor by section 5215.  Betting on horse races, while not made criminal, is not recognized by our courts as a lawful business.  A contract growing out of it will not be enforced.  But this argument on our part is a work of supererogation.  The attorney for defendant supports our views of the law on this subject in the following language in his brief : "As horse racing is a game, it may safely be assumed that any trial of speed or endurance between man and man, or beast and beast, or between man and beast is likewise a game.  A foot race has been held to fall within the category of games.  *Swaggard v. Hancock*, 25 Mo. App. 605.  And dog fights, prize fights, chicken fights, baseball contests, foot races, regattas and all trials of skill, speed and endurance of the kind must necessarily fall within the same category.  \*  \*  \*  It has always been the policy of the law to discourage bets and wagers as being *contra bonos mores.*"

Some of the events mentioned in the act being criminal and bets on some being also criminal, and bets on the others being unlawful, not in the sense of being criminal, but being unlawful because contrary to good morals, and hence contracts growing out of them being non-enforceable, the state in failing to provide a punishment for book-making and pool-selling on events to occur in the state does not thereby sanction or regulate them.  Especially does it seem clear to us that it should not be held that the state sanctions an evil by *implication or inference.*  If it has power to sanction and regulate evil at all, it would require an unequivocal, affirmative declaration by the state to that effect, to accomplish it.

The State v. Burgdoerfer.

It appearing that the state in the act before the court has not sanctioned and regulated anything; that ought to be the end of the discussion; but defendant's attorney claims to have the support of the courts of other states in the cases cited, *supra*, for the position he assumes. We will examine them, and see if they do give countenance to the doctrine contended for.

In *People v. Gadway*, *supra*, the situation was, that, in 1881, the legislature passed an act entitled, "An act to regulate the sale of spirituous, malt, brewed, fermented and vinous liquors; to prohibit the sale of such liquors to minors, intoxicated persons and to persons in the habit of getting intoxicated; to provide a remedy against persons selling liquors to husbands or children in certain cases." In 1883, this law was amended by adding a new section, as follows: "It shall not be lawful for any person, including druggists, by himself, his clerk, agent or servant, directly or indirectly, to sell or offer for sale, furnish or give away, any spirituous, malt, brewed, fermented or vinous liquors, or any beverage, liquors, or liquids containing any spirituous, malt, brewed, fermented or vinous liquors, or suffer the same to be done at any time, within a radius of two miles from the grounds or premises of the Michigan Military Academy, an institution of learning located near Orchard Lake in the county of Oakland in this state." The supreme court of Michigan held this amendment unconstitutional because not germane to the original law which was one of regulation of the liquor traffic. The court says: "The peculiar characteristic of the section added by the amendment is the *restricted and local* application of the prohibition. It segregates from the general territory over which the body of the act extends a certain circle around the premises of the military academy and *in that circle entirely prohibits the traffic. In all other parts of the state it regulates; here it prohibits.*" The italics are ours.

In *Miller v. Jones, supra,* the title of the act assailed was, " An act to regulate the sale, giving away, or otherwise disposing of spirituous, vinous or malt liquors or intoxicating bitters or patent medicines having alcohol as a base, in Talladega county." The body of the act provided for a vote on the question in the county named, and, if a majority of those entitled to vote were in favor of prohibition, then it should be illegal to sell liquor, etc. The supreme court of Alabama says: " But one subject is expressed in the title—the regulation of the sale, giving away or otherwise disposing of liquors—and the inquiry is, does the title express the subject contained in the enactment; in other words, are regulation and prohibition the same or distinct subjects? *Regulate* and *prohibit* have different and distinct meanings. * * * To regulate the sale of liquors implies, *ex vi termini,* that the business may be engaged in or carried on subject to established rules or methods. Prohibition is to prevent the business being engaged in or carried on, *entirely or partially.*" And the act was held unconstitutional because the subject was not expressed in the title. The enactment was held to be prohibitory though the prohibition was conditional. If a majority was against the sale of liquor, no liquor could be sold; if a majority was not against such sale, then liquor might be sold. Hence the prohibition provided by the law was *conditional* and not absolute, and yet it was held to be a law *to prohibit* the sale of liquor.

In *In re Hauck,* this question came again before the supreme court of Michigan and was decided, May 18, 1888. 38 N. W. Rep. 269. In 1887, the legislature passed an act entitled, " An act to regulate the manufacture and sale of malt, brewed, fermented, spirituous and vinous liquors in the several counties of this state." The body of the act provided that the question of the sale of liquors might be submitted to a vote of the people of the respective counties, and, if a majority of those

entitled to vote were against the manufacture and sale of liquor in any county, then it should be unlawful to manufacture or sell liquor in such county, and the general law on the subject should be suspended therein. The court says: " When it ( the law ) was enacted, there was a general law in force regulating the sale of spirituous, malt, brewed, fermented and vinous liquors under certain restrictions and limitations, upon complying with which and paying the taxes prescribed . by another general law, it was lawful for any person to engage in the manufacture and sale of such liquors in any county of this state. These general laws were not repealed by the passage of the act in question. In reviewing these various sections, it is apparent that the object of the act is to prohibit the manufacture and sale of liquors to be used as a beverage. There is no attempt by the legislature to disguise this object in the body of the act," and the court held that the act was unconstitutional, because its title was to regulate, and the enactment itself was to prohibit the liquor traffic on certain conditions. Here, again, as in the Alabama case, this act was construed to be one of prohibition, though such prohibition was *partial and conditional.* The case of *Town v. Sainer, supra,* is to the same effect.

The supreme court of New Jersey in *State v. Committee, etc., supra,* held that *partial* prohibition of the liquor traffic was regulation of that traffic *in support of the constitutionality of an act.* This ruling is in direct conflict with the Iowa, Michigan and Alabama cases cited. But the New Jersey court proceeded upon the theory that a general law made the traffic lawful and regulated it, and the act assailed was upon the same subject, and provided for *further regulation on certain conditions.*

The principle of the Iowa, Michigan and Alabama cases is that, where there is a general law providing for the licensing of the liquor traffic, the *conditional prohibition* of it in a prescribed territory is prohibition,

and not regulation within that territory. That principle has no application to the act in the case at bar. In the case of the liquor traffic, a *positive law* sanctioned it. In the case of book-making and pool-selling there is no positive law sanctioning them. In the former case it is held that it is not the use, but the abuse, of liquor that is hurtful, and that the sale of it for legitimate purposes is not immoral. In the latter case, book-making and pool-selling are held to be contrary to good morals, and the courts refuse to enforce contracts growing out of them.

But the act before the court is prohibitory in its entire scope and purpose. It does not prohibit *all* book-making and pool-selling on the events named, but as far as it attempts to deal with the subject it prohibits them. The act is not, it is true, as broad as the title, but it is germane to and included in it. Logically, some prohibition is included in *all* prohibition. Logically, the title does *contain* the subject of the act. The title does not give notice how the prohibition is to be effected, or to what extent, whether partially or wholly, whether by making the act prohibited a felony, or a misdemeanor ; but it does give the information that the act is for the *prohibition* of book-making and pool-selling. In *In the Matter of Burris*, 66 Mo. 446, this court speaking of an act entitled, "An act in relation to county clerks," used this language. "It was not intended that the substance of the act should be embraced in the title ; but that the subject should be stated in general terms, not specifically. For instance, an act was passed by the general assembly in 1877 entitled, 'An act for the protection of married women.' The title does not indicate in what that protection was to consist. By the title alone, one would not know whether it was to protect married women in their rights of property, or in their persons, or in what manner the protection was to be afforded, whether by conferring

upon them the right of suffrage, etc., * * * but it does apprise one that it is a law for their protection."

This reference to the married woman's act well illustrates the principle that the title of an act may contain a *generic* term, and the body of the enactment be specific, and the act be upheld, provided the enactment itself is germane to and included in the subject of the title. Cooley on Constitutional Limimitations pages 172 to 173, says: "The generality of a title is, therefore, no objection to it so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection."

In *Luther v. Saylor*, 8 Mo. App. 424, the act in question was an act entitled, "An act to better secure the wages of laborers and operatives." The enactment itself provided that all employes and operatives of *railroad and other corporations* should have priority of payment of their wages over other creditors. This law was assailed on the ground that the title indicated that *all* wages of *all* employes and operatives, by whomsoever employed, were to be secured, while the benefits of the act in its body were limited to the employes and operatives of *railroad and other corporations only*, and, therefore, that the body of the act was not coextensive with its title. The court held that the act was not violative of the constitutional provision under discussion. Judge HAYDEN, speaking for the court, said: "Here are no uncongruous and unconnected matters joined. The title fairly expresses the subject of the act. Though it is too broad, the title is not adapted to deceive. An act cannot be declared void merely because qualifying phrases might have been used in the title which would more exactly have shown the limitations of the act. The title must still be a title, which implies generality. Here the general subject is clearly expressed in the title, and what might properly have been added *would have been only a limitation upon the scope of the act* * * * . It is sufficient if it

fairly gives notice of the subject so as reasonably to lead to inquiry into the body of the bill. *Alleghany County Home's Appeal*, 77 Pa. St. 80."

Having discussed one phase of the constitutional provision in its relation to the case at bar, and in its relation to the power of the judiciary to set aside an act of the legislative and executive departments of the state government, and having determined that the act in question contains but one subject, which is expressed in its title, let us proceed to a consideration of the other phase of this provision in its relation to the case in hand and in its relation to the judicial power mentioned above. The other phase of this provision is the requirement that the title of the bill shall *clearly* express its subject. When it comes to this phase of the provision, the duty of the court is not so plain as in the other case. Here we find no solid ground on which to stand. We enter here a region of doubt, a debatable land, whose boundaries have not been fixed, cannot be fixed and are not plainly perceived. What appears clear to one mind, may not appear clear to another. The whole provision should be liberally construed, but especially should the courts hesitate to declare a law unconstitutional because the title does not clearly express the subject of the act. We feel satisfied of one thing, and that is, the words "clearly expressed" are not used in the sense of exact definition. It was intended the title should be a fair, though general index of the subject-matter of the act. The general rule is succinctly stated in *State ex rel. v. Miller*, 100 Mo. 445, as follows: "In adopting a title, the legislature may select its own language and may use few or many words. It is sufficient that the title fairly embraces the subject-matter covered by the act; mere matters of detail need not be stated in the title."

If the title must contain an *exact* definition of the subject of the act, no safe course would be left for the legislator except to make the title coextensive, not only

in meaning, but in phraseology, with the body of the enactment. If the courts are justified in setting aside an act of the legislature on the ground that the title fails to give the exact scope of the enactment, it is probable not a single statute in our state could stand the test of judicial scrutiny. But this was not the intent of this requirement. The title must express the subject of the act in such terms that the members of the general assembly and the people may not be left in doubt as to what matter is treated of. The terms of the title must be such as to unequivocally put everyone upon inquiry into the contents of the bill.

The inhibition under review must be construed in the light of the other provisions of the constitution in *pari materia*. These provisions are: *First.* No bill shall be considered for final passage unless the same has been reported upon by a committee and printed for the use of the members. *Second.* All amendments adopted by either house shall be incorporated with the bill by engrossment and the bill thus engrossed shall be printed for the use of the members before final passage. The engrossment and printing shall be reported by a committee to be correct. *Third.* Every bill shall be read on three different days in each house. *Fourth.* No bill shall become a law until signed by the presiding officer of each house, who shall suspend all business and cause the bill to be read at length in open session. *Fifth.* It then goes to the governor for his action. Take these provisions in connection with the fact that the halls of legislation are flooded with the daily papers of our large cities containing accounts of the proceedings of the general assembly, with copious comments *pro and con.*, and it seems to us it would be a difficult task to pass a bill by a trick, through all committees of both houses, and have it approved by the governor. A legislator sees the act entitled, "An act to prohibit book-making and pool-selling," lying printed on the table before him. It has but *one* section. Will he

vote for it on its title alone? Will he not inquire how these things are to be prohibited, what punishment is to be inflicted, indeed, what book-making and pool-selling are to be prohibited? By devoting three minutes' time to a perusal of the bill he can learn its scope and object.

But this bill in its original form did prohibit all book-making and pool-selling on the events named in it, and it was amended by striking out all after the title and inserting the enactment as it finally passed. The amended bill was printed and laid before the members. Is it possible any member would still fail to read either the original or amended bill or make inquiry as to its scope or the extent and intent of the amendment? The argument is that some member might vote for the bill upon the supposition that it prohibited *every variety* of book-making and pool-selling and that he would not have voted for it if he had known it only *partially* prohibited them. Is not such a supposition preposterous? This act comes to us with the sanction and approval of *two* co-ordinate branches of the government. It was introduced in the senate on the ninth day of January, 1891, and was finally approved by the governor, April, 1. In the meantime it had gone through the committee on criminal jurisprudence and of the whole in both houses, had been amended and numerous amendments had been defeated. It passed the senate by a vote of twenty-five to ten and it was read and approved. It passed the house by a vote of seventy-seven to nineteen and its title was again there read and approved. Among the members of the general assembly are to be found some of the ablest lawyers in the state. The senators and representatives come from city and country, and from every department of business and commerce, and this court should not set aside this law unless the inference is irresistible that the title did in fact mislead those who voted for it.

"No question," says NORTON, C. J., in *State ex rel. Maggard v. Pond*, 93 Mo. 618, "of more delicacy or

importance ever comes before a court of last resort than one which involves the constitutionality of an act passed in due form by the legislative department of the government." And he adds that the court should "approach the question with great caution and never declare a statute void unless in their judgment its nullity and invalidity are placed beyond a reasonable doubt. No rule of construction is better established both on principle and authority than that acts of the legislature are presumed to be constitutional until the contrary is clearly shown. The solution of such a question ought not to be made by a resort to mere verbal criticism, subtle distinctions, abstract reasoning, or nice differences in the meaning of words." See other authorities cited in the *Pond case, supra.*

Would it not be presumptuous in us to declare as a matter of law that the members of the general assembly and the governor did not know the contents of the bill? Is it possible that, during the three months this bill was pending, not a single member undertook to ventilate it? Can we fairly assume that the ten senators and nineteen representatives who voted against this measure sat silently by and permitted a *fraud* to pass both houses of the general assembly and be approved by the governor? And, if we could imagine that the members of the legislature took so little interest in this measure as to make no inquiry about its scope, but voted for it blindly on its title, supposing that the act itself would exterminate book-making and pool-selling by the most effectual means where was defendant, who was engaged in the business, and others, probably, and their friends, that they took no step to prevent the contemplated fraud? Or did they assume also, from a perusal of the title, the act was intended to dig up book-making and pool-selling root and branch and to utterly destroy them, and they were happy in the contemplation of the passage of *such* a law? There is no reason in any view that may be taken of the subject, to hold

that the title of this act was intended to deceive, was calculated to deceive, or did deceive, any one.

Our conclusion on this point is that the act did contain but *one* subject which was *clearly expressed* in the title within the meaning of the constitutional provision.

II. The second contention of defendant is, that the "act in question is in no proper sense a legitimate exercise of the police power of the state." His argument on this point proceeds upon the theory that, if the state undertakes to eradicate an evil, it must utterly exterminate it in all its ramifications, and if it fails to do this and deals with the evil in a *partial* way its action is void. Defendant concedes that all betting and wagering is immoral and an evil, and he comes to the court, and by his motion to quash the information admits that he has done wrong in one direction, and then asks to escape punishment on the extraordinary ground that the legislature failed to prohibit him from doing wrong in another direction.

Wagering of all kinds is clearly within the police power of the state. *City of St. Louis v. Fitz*, 53 Mo. 585; *State v. Addington*, 77 Mo. 117. If every act should be set aside because it failed to prohibit all of the evils of the class to which the legislation is directed, probably not a single criminal statute could stand a close scrutiny. The legislature has a discretion not only in what it will prohibit but also in the method of the prohibition within the domain of its power. An evil may exist in such a form that the state may not choose to attempt its suppression by law, and again the same evil, by the centralized form it takes, may imperatively demand state interference in the interest of public morality and the good order of society. The Louisiana lottery is a good illustration of a centralized evil. So here we fairly assume that our legislature intended to strike the business of book-making and pool-selling in its nerve center and thus prevent

rendezvous from being established as temptations and snares for the unwary and the young.

We know of no law or reason requiring legislatures to punish the same act under any and all circumstances. They often distinguish between the same acts, holding some harmless, while punishing others, according to time, place and circumstances. Lotteries are prohibited only when carried on as a business or avocation. Selling liquor is permitted, but the sale of it on Sunday or in a prescribed territory may be prohibited. Keeping a bawdy-house becomes a felony only when it is done within one hundred yards of a public building. Discharging a pistol is penal, if done in the vicinity of a court house or along a public road. The playing of musical instruments in a saloon is made a misdemeanor. The legislature was the sole judge of how the evil of book-making and pool-selling should be reached, and when and where. This act may not accomplish all its originators hoped for. It may be evaded. It may not have gone as far as it ought. It may be a temporizing expedient. It may have been intended as an experiment only. These are all outside of the question in hand. "Much of the argument made by counsel for relator is addressed to the impolicy of the act. That line of the argument is proper for the legislative ear, but not for ours. With its policy we have nothing to do." *Pond's case, supra.* But from its very nature the police power of the state is a power to be exercised within wide limits of legislative discretion; and if a statute appears to be within the scope of this power, it would be an usurpation of jurisdiction for the judicial courts to inquire into its wisdom and policy or to substitute their discretion for that of the legislature. *State v. Addington, supra.*

III. The concluding point of objection to the act is that it violates the fourteenth amendment to the constitution of the United States, in denying the defendant the equal protection of the laws. That it does not deny

defendant the equal protection of the laws, is settled by
a long line of decisions of the supreme court of the
United States. In *Barbier v. Connolly*, 113 U. S. 27,
the construction of an ordinance of the city of San
Francisco prohibiting the washing and ironing of clothes
in public laundries and wash houses within certain pre-
scribed limits of the city and county from ten o'clock at
night until six o'clock in the morning was involved.
Judge FIELD, delivering the opinion of the court, says:
"But neither the amendment, broad and comprehen-
sive as it is, nor any other amendment, was designed to
interfere with the power of the state, sometimes termed
its police power, to prescribe regulations to promote the
health, peace, morals, education and good order of the
people, and to legislate so as to increase the industries
of the state, develop its resources, and add to its
wealth and prosperity. From the very necessities of
society, legislation of a special character, having these
objects in view, must often be had in certain districts,
such as for draining marshes and irrigating arid plains?
Special burdens are often necessary for general bene-
fits, for supplying water, preventing fires, lighting
districts, cleaning streets, opening parks, and many
other objects. Regulations for these purposes may
press with more or less weight upon one than another,
but they are designed, not to impose unequal or
unnecessary restrictions upon anyone, but to promote,
with as little individual inconvenience as possible, the
general good. Though, in many respects, necessarily
special in their character, they do not furnish just
ground of complaint if they operate alike upon all per-
sons and property under the same circumstances and
conditions. Class legislation, discrimination against
some and favoring others, is prohibited, but legislation
which, in carrying out a public purpose, is limited in
its application, if within the sphere of its operation it
affects alike all persons similarly situated, is not within

the amendment." *Missouri v. Lewis*, 101 U. S. 22; *Slaughter-House Cases*, 16 Wall. 36.

The act under review is uniform in its application, operating upon all alike who come within its provisions. The defendant has the same opportunity to make books and sell pools upon events occurring in Missouri, that any other citizen has, and all others are prohibited from doing what he is forbidden to do. Hence he has no reason to complain on the ground that he is denied the equal protection of the laws.

Our conclusion is, the court of criminal correction erred in sustaining defendant's motion to quash the information, and its judgment is reversed, and the cause remanded to that court for trial.